JOHN H. LEWIS AND WIFE, APPELLANTS, VS. GREGORY YALE, APPELLEE.

It is a well settled principle of law that where husband and wife file a joint answer, such answer may not be read in evidence against the wife, where the subject matter relates to her estate of inheritance.

A *femme covert* is not competent to enter into contracts so as to give a personal remedy against her.

When, therefore, a bill seeks to affect the separate property of the wife, through her personally, it should be dismissed. The wife may pledge her separate property, but in order to charge it, her trustees must be made parties to the bill.

There cannot be a decree *in personam* against a married woman, even where she has signed the contract, the specific performance of which is sought.

The power of the Courts to reform contracts between attorney and client, is limited to the duty of protecting the latter against the undue influence of the former. Therefore, where a special contract has been entered into, by which the value of the services of an attorney has been fixed and ascertained, a Court of Equity cannot interpose to increase the compensation agreed on.

The question of title, so far as respects charges and incumbrances, depends upon their character and amount. Upon a reference to a Master, if it should be ascertained that they are of such a character and amount as to enable a vendor to get them in within a reasonable time, the report should be in favor of the title.

A Court of Equity cannot award compensation in damages for injury sustained by non-performance of a contract, where the primary relief (specific performance) cannot be decreed.

As a general principle, it may be asserted that a party seeking a specific performance must recover on the case as made in the bill; but such latitude has been allowed in the matter of amendments, as to authorize a plaintiff to amend his bill, and take a decree according to the case made by the answer.

Appeal from a decree of the Circuit Court of the Eastern Circuit, sitting in Equity in and for the County of Alachua, made by the Hon. THOMAS DOUGLAS, Judge.

The case is stated in the opinion.

*Archer* and *DuPont* for Appellants.

*Forward* for Appellee.

THOMPSON, *Justice*, delivered the opinion of the Court.

It appears from the facts in this case that the appellant, Mary, wife of the other appellant, was, at the time of their intermarriage, seized in fee, as the residuary divisee of her father, Samuel Betts, of an interest or share of a tract of land in East Florida, known as the " Alachua Arredondo Grant," as tenant in common with divers other persons—that a suit in equity for the partition of the respective interests of the several owners, was instituted by some of the tenants against the others, among the latter of whom were the present appellants—that the appellants employed the respondent, who is a solicitor and counsellor, to represent them and defend their interests in the said litigation —and out of this employment, the present suit has arisen.

The respondent, who was complainant in the Court below, alleges in his bill in detail the foregoing facts, and that after a decree for partition had been passed in the partition suit, ascertaining the respective interests of the tenants, and among others that of the appellants as 62,000 acres, out of the aggregate of the whole, amounting to 250,000 acres, or thereabouts, the appellants, by John H. Lewis, entered into a contract with him for his remuneration, which contract is in writing, and is exhibited with the bill. It is in the following terms : " In consideration " of services rendered as counsel, in behalf of myself and " wife, in the partition of the Alachua Grant, by Gregory " Yale, Esq., I bind myself to have conveyed to him by " deed of release, with special warranty, one thousand " acres of land, the same to be of average quality to the " total amount of sixty-two thousand acres decreed to Ma- " M. Lewis, at the Superior Court of St. Augustine, sitting " this month. Witness my hand and seal, the 4th July, " 1845. JOHN H. LEWIS, [SEAL.]"

Although the consideration of the promise and the covenant to convey the land, seems, by the terms employed, to have been a past or executed consideration, yet both parties admit, and the proofs in the cause show it was not considered as such by either party, but was intended to and did include such future services of the respondent as were incident to and should be requisite and necessary to be performed in and about the execution of the decree, and the confirmation thereof by the Court. Subsequently, however, to the decree aforesaid, which in point of fact was not carried into full execution, the report of Commissioners under said decree being excepted to, further litigation ensued, in an application by some of the parties for a re-hearing, and to set aside the decree on the ground of surprise, and subsequent discoveries of matters affecting their rights, and also in the filing of a supplemental bill or bill of review.

The bill further alleges that the respondent attended to this additional litigation as solicitor and counsel for the appellants, and made divers necessary journies and attendances at distant places and Courts, and which were and ought to be considered as distinct substantive services, for which he should have been allowed additional compensation. He further alleges that on opplication by letter to the appellant, John H. Lewis, the said appellants agreed, by letter of the 12th of April, 1847, enclosing copy of a letter to the Hon. Wm. Law, of the 7th of April, 1847, so to modify the contract of July 4th, 1845, as to give to the said respondent the "right of location" of the said tract of land, which he seems to consider in his said bill of complaint as equivalent to the right of selection, by claiming to be entitled to " a selection or right of location of one thousand " acres under said modified contract," omitting the qualification of its average quality.

The bill further alleges the submission by the tenants or claimants of the land, of the question of their respective interests to the arbitrament of the Hon. Isaac H. Bronson, the award of the arbitrator by which the interest or share of the appellants was ascertained and fixed at 24,000 acres of land—the confirmation of the award, and such other proceedings as finally led to a sale of the whole tract, for the purposes of a partition, and the purchase by the appellants of 11,774 acres.

The bill further alleges a refusal by the appellants to convey one thousand acres of land, to be selected by the said respondent, out of the land in their possession, and prays a decree for the specific performance by the conveyance of one thousand acres of land selected by the respondent, as provided in the modified contract, or compensatory damages in lieu thereof.

The appellants answer the bill in a joint answer, and to which reference will hereafter be made. It will be sufficient here to state that the contract, as it is understood to be insisted upon in the bill, is denied, although a contract is admitted, which they allege they have at all times been willing to perform, have offered to perform, and are still willing so to do.

In the examination of the questions presented by this record, it will be important primarily to consider and ascertain who are properly the parties to this contract, and what has been agreed upon by them.

The respondent in his bill alleges that the contract was made by both the appellants, Mrs. Lewis assenting and acting through her husband. Is this allegation correct? The covenant of July 4th, 1845, is signed by John H. Lewis alone, and by its terms it professes to be entered into by him alone, and to be binding on himself, and not on any other person, although from the expression that he

" binds himself *to have conveyed*" the land mentioned, he must be understood as contracting for the conveyance of property, in which he did not assert a perfect title in himself.

It is true that the consideration expressed is for services rendered to both Lewis and Wife in the partition suit, and the tract of land to be conveyed is to be carved out of the lands decreed in the suit as the property of the wife : yet there is not one word which evinces an intention to bind her, or to make her a party to the covenant.

It is impossible to give any other interpretation to this instrument than that it is a personal contract of John H. Lewis. So also, the correspondence by which the contract is claimed to be modified and enlarged, is between the appellant, John H. Lewis, and the respondent. John H. Lewis in this speaks of himself alone : what he thinks, what he is not willing to grant, and what he does concede. The counsel for respondent has argued with much earnestness the admissions of the joint and several answer of the appellants, and especially the answer which they jointly make to the ninth interrogatory as conclusive upon the point. That interrogatory requires the disclosure, whether the said appellants did not enter into a contract with the respondent, as in the said bill is set forth, and whether or not, the " copy of the obligation of July 4th, 1845, by " the said Lewis and Wife, through the said John H. Lew- " is," is not a true copy, &c. ? And the answer is, they " admit they entered into a contract with the complainant " for his services, that they have no copy or duplicate of " said contract, and ask that the complainant verify his al- " legation," &c., but admit they believe the copy exhibi- tion to be a true copy. This admission of Mrs. Lewis, so totally at variance with the exhibits and proof of the re- spondent, the written contract and the letters in evidence

can only be ascribed to inadvertence, or to the peculiar structure of the interrogatory to which it is an answer, as leading to the error. Or it may have been supposed by the appellants or their counsel to be a corollary from the facts elicited and brought out by the twenty-ninth interrogatory of the bill, viz: "That the defendant, John H. "Lewis, has been the agent of the defendant, Mary, his "wife, in all things touching her interest in the Arredondo "Grant; that she was knowing to and did sanction "the contract between the complainant and John H. Lew- "is and a modification thereof, but not as set forth by "the complainant, and to that construction, understanding "it according to the construction given thereto by the com- "plainant, she never could have assented but under du- "ress: they admit fully her knowledge of the fact that "complainant, since his connection with the suit, has been "of counsel in their behalf, and that John H. Lewis has "been, as meet he should have been, her counsel and ad- "viser in the premises."

In such a conclusion we cannot concur. If John H. Lewis, as agent of his wife, had power or authority to bind her in this contract, he has not executed or pretended to execute the power. There must be a contract in writing signed by the party to be charged, or by some one duly authorised.

In Aylett vs. Ashton, 1 Mylne & C. 105, a *femme covert*, possessing property, two-thirds of which was supposed to be settled to her separate use, and the remaining third to belong to her brother in India, whose concurrence it was represented she could procure, in the presence of her husband, and with his concurrence signed an agreement in writing to grant a lease. The husband present offered also to sign the agreement, but it was waived as unnecessary. It was soon after discovered that one-fourth only

was settled to her separate use; to one other fourth she was entitled absolutely; one fourth belonged to her brother in India, and the remaining fourth had belonged to a deceased sister, which latter was afterwards purchased by the husband. On a bill against husband and wife for a specific performance, it was held, that the husband, not being a party to the contract, there being no written agreement signed either by himself, or by a person duly authorised in his behalf, there could be no decree against him for his marital interest, in the fourth owned absolutely by the wife, or for the other fourth which he had purchased, and which he held in his own right.

But a full and conclusive answer to the argument is to be found in the principle of law, that where husband and wife put in a joint answer, such answer may not be read in evidence against the wife, where the subject matter relates to her estate of inheritance. Evans vs. Cogan, 2 P. Wms. 450. Hodgson vs. Merest, 9 Price R 556. Elston vs. Wood, 2 Mylne & C. 678.

It may be as well however to state, in this connection, as we will have to advert to the point when we come to the consideration of the decree, rendered in this cause, that the respondent's case, as made by the bill, would not have been aided, if Mrs. Lewis had signed the contract with her husband.

The prayer for a specific performance involves a decree *in personam* against her, which a Court of Equity cannot grant. There is no case, says Vice Ch. Plumer, in which this Court has made a personal decree against a *femme covert.* She may pledge her separate property and make it answerable for her engagements; but where her trustees are not made parties to a bill, and no particular fund is sought to be charged, but only a personal decree against her, the bill cannot be sustained. Francis vs. Wigzell, 1 Mad. R.

148. Hulme vs. Tenant, 1. Bro. C. C. 16. In Aylett vs. Ashton, before cited, the bill was dismissed as to the wife, as well as the husband. The Court says, a *femme covert* is not competent to enter into contracts, so as to give a personal remedy against her. The bill there, like the present, did not seek to affect the separate property, except through Mrs. Ashton personally.

If, says the Court, it had sought to affect the property upon the ground that the contract had given the plaintiff a right against the property, the suit would have been brought against the trustees ; for there must be some trustees of that part of the property settled to her separate use. Although a *femme covert* has power, and the Court has jurisdiction, over the rents and profits of her separate property, no case has given effect to her contracts against the *corpus* of her separate estate. The recent case of Owens vs. Dickinson, 1 Craig and Phillips R. 48, to which we have been referred, is not in opposition to the doctrine here asserted.

Although we are satisfied that Mrs. Lewis is not a party to the contract, yet we think she is properly made a party to the bill, because it is her property which is the subject matter of the contract. The bill should, however, not in such case, pray any discovery from, or relief against her.

We will now proceed to the consideration of the terms of the agreement. As to the covenant of July 4, 1845, and its proper interpretation, there is no contest. It is admitted that thereby John H. Lewis promised and agreed, as the remuneration for the services of respondent, to have conveyed to him by deed of release, with special warranty, one thousand acres of land, the same to be of average quality to the total amount of 62,000 acres decreed to Mrs.

Lewis, and, of course, as interpreted by the respondent, of the average of the entire tract of 250,000 acres.

It seems likewise to be admitted by the bill of complaint. and by the letters of respondent, that although the consid, eration expressed was for services rendered, yet that certain duties "necessarily incident to, and connected with, "the duties of the Commissioners, and the action of the "Court thereon," remained to be attended to on his part. The report made by the Commissioners under the decree of June Term, 1845, was excepted to, and was never confirmed. The difficulties specified and detailed in the bill arose, which were only finally settled by the award of the Honorable Isaac H. Bronson, on the reference to his arbitrament of all the matters in difference between the owners of the Arredondo Grant, touching their respective interests.

Pending these difficulties, the respondent addressed the appellant, John H. Lewis, the letter of the 29th of January, 1847, (Exhibit K.,) in which he states that, since the decree of June Term, 1845, new and important matters have come to light, unknown at the time of the contract of July 4, 1845, giving a new character to the controversy, and producing, in a certain sense, the only litigation in the case; that he had attended to it exclusively at great labor and sacrifice; that he had, so far, realized nothing for his services, and, to be candid, he regarded the one thousand acres of an average quality out of the 62,000 acres, and that again of an average quality out of the 250,000 acres of the Grant subject to distribution, as being subject to "precarious location," of little value, unless he should receive the estimated value made by the Commissioners. This, he says, he is willing to do, and to stand by Lewis in the lower Courts until the case shall end, if he (Lewis) will give him that estimate for the one thousand acres.

This letter is not only important, as the first of the series

which led to the modification, as it is termed, of the original contract, but because it gives also the grounds of dissatisfaction with it, namely : more labor than he had anticipated, by the new aspect the case had assumed, and the *precarious location* to which the land promised by the contract was subject.

The complaint is not that one thousand acres of land of average quality, is not sufficient compensation, for he offered to go on to the end of the law suit in the Circuit Court, if he can only be secure in the receipt of the average value fixed by the Commissioners, which, we presume, was the received opinion, at the time, of the value of the lands.

To this letter, John H. Lewis replies, on the 15th of February, 1847, and parries the application, saying : " I " beg you not to discuss your interest in the Lion's skin " until it is off his back. You would not have had, nor " shall you have, any cause of complaint, when the battle " is ended. Our enemy now should be our care." This answer being unsatisfactory, the respondent again addresses Lewis on the 2d March, 1847, and expresses his unwillingness that the question of a new arrangement of his compensation should be thus indefinitely postponed ; again urges its consideration upon him, and pointedly and distinctly informs him that if he (Yale) continues to act as his solicitor and counsel, he (Yale) must have the privilege of selecting one thousand acres out of the quantity which shall be ultimately decreed to appellants, instead of the same quantity of land of average quality, according to the contract of July 4th, 1845, or that he should be paid in money at the rate of one dollar and fifty cents per acre. In this letter, he distinctly asserts that he considers all services he has rendered since the rendition of the decree of

19

June Term, 1845, except as incidental to that decree, as extra, and entitling him to additional compensation.

The senior counsul, the Hon. William Law, having, as it appears, made a similar application, about the same time, for an increase of compensation, the appellant, John H. Lewis, replies to William Law on the 7th, and to the respondent on the 12th of April, 1847.

It seems that the application of Mr. Law, as well as that of the respondent, was for the right to select lands. In the letter to the Hon. William Law, the appellant, John H. Lewis, says : " If litigation ensues beyond what could have " been reasonably anticipated when we entered into the " contract, and which should justify a claim to equitable " compensation, I will; under the contract, submit to im- " partial counsel, what this shall be, or I will give you your " election, under your contract, to take money and land, or " land only ; or, should you prefer it, I will give you such " a favorable location as will ensure a speedy sale." And again he says to him : " If you knew the value of the se- " *lection* of lands you propose, you would not think it just." Of the respondent's claim, he says : " Mr. Yale, who has " borne manfully the brunt of the battle, asks me for a fa- " vorable location. I shall concede it to him, as his atten- " tion, zeal and talents entitle him to the boon beyond his " contract." A copy of this letter is enclosed to the res- pondent, and he is informed in the letter of the 12th of April that, so far as concerns his interest, it may be re- garded as the answer to his letter. He says, further, that he, (John H. Lewis,) trusts it will prove satisfactory, and says that it is yielded not only as the proper reward of res- pondent's diligence, but to prove the writer's conviction that there should be, at all times, not only good faith and inviolable fulfilment of contracts between counsel and cli- ent, but that the friendliest feelings should prevail. In

this letter, Mr. Lewis speaks of an application by respondent for a *favorable location*, which was the application of the 29th of January, overlooking the fact that in the letter of the 2d of March, the respondent's demand is enlarged to the claim of a right to select lands, or probably being misled by the fact that the alternative, or money proposition, was the same in both letters, viz: fifteen hundred dollars.

It is to be observed that the appellant, John H. Lewis, neither in this nor any other letter, makes the slightest admission of the performance of extra services calling for adtional compensation. Indeed, in the letter of the 7th of April to Judge Law, he says: "To avoid misconstruction "of this offer, I wish it to be understood that I shall not "deem this as a substitute for the original contract, or that "unexpected litigation has occurred, unless it may be ne-"cessary for you to attend other terms than the next at St. "Augustine.'"

From this extract, and the ground upon which Mr. Lewis puts the modification of a favorable location conceded to the respondent, it will be seen that he fairly informs his counsel that he does not admit as true the existence, at that time, of unexpected litigation since the decree of June term, 1845, which would warrant a claim to extra compensation. On this point they are at issue.

On the 18th of May, the respondent, acknowledging the ceipt of Mr. Lewis' letter of the 12th of April, says: "Un-"derstanding from the letter to Judge Law, to which "you refer in mine, that you concede to me the right of loca-"tion, and so far modify the contract of July 4th, 1845, I "hereby express myself satisfied with the modification." The respondent here, it will be seen, varies the form of expression. Mr. Lewis says he concedes to him a "favorable location," which the respondent interprets or says he

understands it to be the "right of location." If there be any substantial difference between the two phrases, which it is not material for us to inquire into, and if the correspondence had closed here, a well founded doubt would arise whether the minds of the contracting parties had assented to the same thing.

But the appellant, John H. Lewis, on the 29th May, acknowledges the receipt of this letter, and expresses himself gratified that the respondent is satisfied with his modification of the contract of July 4th, 1845, and says he (Lewis) always intended to go beyond his contract, but was unwilling to define limits until the result was ascertained and the measure of service fully surveyed.

By this we ascertain that by the terms or phrase, "a favorable location," the appellant, Lewis, and the respondent both understood that the latter should have the right of location, and we have now the terms of the contract as modified. Is the respondent correct in his interpretation thereof when he treats the "right of location" conceded by this correspondence, and the "right of selection" demanded by his letter of the 2d of March, as convertible terms or expressions?

Recurring to the respondent's letter of the 29th of January, we find the complaint to be founded on the fact that his one thousand acres of land, of average quality, was subject to "precarious location," and, therefore, of little value, unless he could realize the average price or value thereof, as estimated by the Commissioners, of one dollar and fifty cents per acre. We understand him as expressing the opinion that the contract of July 4th, 1845, might be satisfied by the conveyance of any tract of the quantity of one thousand acres, which will answer to the quality of an average, no matter where it is located or placed, within the limits of the grant, and therefore of little value to him.

He therefore desires that the average value shall be secured to him, irrespective of location, by an undertaking on the part of the client to pay that value in money, assuming the correctness of the Commissioners estimate; and although in his letter of the 2d of March, he asks to be allowed to select one thousand acres from the body of land which may be ultimately decreed to the appellants, yet he presents the same money alternative of fifteen hundred dollars, the average price of one dollar and fifty cents per acre, showing that his claim did not at this time exceed the average value so estimated. Again, in the letter of May 18th, after stating his understanding of the concession made by Lewis, he adds, "*and so far modify*" the contract of July 4th, 1845, clearly indicating that all he asked for was not granted. Coupling these facts with the very emphatic expression of the appellant, John H. Lewis, to Judge Law, in his letter of the 7th of April, that if the counsel knew the value of one thousand acres of selected land, he would not think it just, we are bound to conclude that the intention to concede this requisition did not exist in the mind of John H. Lewis, and that the respondent could not at the time have so understood him. The value of one thousand acres selected from the tract, according to the proofs in the cause, and the concession of counsel for respondent in the argument here, is stated to be worth at least seven thousand dollars, and this fact well justifies the remark of Mr. Lewis as to the want of justice in the requisition. If Lewis had yielded to the importunity of the respondent, and was now here resisting the performance of the promise, upon reason and authority, this Court would be bound to declare it unconscionable. Justice Story, in his observations upon the relation of client and attorney or solicitor, says that it must give rise to great confidence between the parties, and to very strong influ-

ences over the actions and rights and interests of the client. The situation of an attorney or solicitor puts it in his power to avail himself not only of the necessities of his client, but of his good nature, liberality and credulity to obtain undue advantages, bargains and gratuities. Hence the law, with a wise providence, not only watches over all the transactions of parties in this predicament, but it often interposes to declare transactions void which, between other persons, would be held unobjectionable. By establishing the principle that, while the relation of client and attorney subsists in full vigor, the latter shall derive no benefit to himself from the contracts, or bounty, or other negotiations of the former, it supercedes the necessity of any inquiry into the particular means, extent and exertion of influence in a given case—a task often difficult and ill supported by evidence which can be drawn from any satisfactory sources. Comm. on Eq. Ju., 310. So a gift made to an attorney *pendente lite* will be set aside, as arising from the exercise of improper influence; for it has been said with great force that there would be no bounds to the crushing influence of the power of an attorney who has the affairs of a man in his hands, if it were not so. And sales made and annuities granted to attorneys under similar circumstances, will, upon the same principles of public policy, be set aside, at least unless they are established to have been transacted *uberrima fide*. Ibid, §312.

But we are very clear in the conclusion that the modification or enlargement of the agreement extended only to the right to locate the tract upon lands of average quality within the grant—that no more is conceded, and that the right to select land is limited and restricted to the lands of average quality, and this we find to be the contract admitted in the answer of the appellants.

It has been urged upon the Court by the counsel of the

respondent, that this construction of the contract of the appellant, John H. Lewis, makes the remuneration grossly inadequate to the services rendered the appellants, and from the proofs at the hearing it is no doubt as he alleges. All unite in their testimony of the merit of the respondent, and none gives stronger evidence in his favor than Mr. Lewis himself. We can only express our regret that he should not receive adequate compensation for his labor, skill and fidelity, but we cannot afford any remedy. In the absence of a special contract, the Courts will afford solicitors, attorneys and counsel every legal and proper facility to secure a fair and reasonable remuneration for services rendered; but when a special contract is entered into, by which the value of the services is to be ascertained or measured, or where property is accepted in lieu of money, the Courts can only enforce the contract according to the legal import of its terms. The power of the Courts to reform contracts between attorney and client, is limited to the duty of protecting the latter against the " crushing influence of the power" of the former, and to relieve him from unreasonable and unconscionable exactions, agreements, gifts, &c.

The decree rendered in this cause in the Circuit Court, recites that specific performance of the contract set forth in the bill, cannot be decreed. Why, we are not informed. It cannot be for the reason that Mrs. Lewis refuses to join her husband in the execution of a conveyance, for there is no evidence in the record of such refusal. It cannot be, for the reason that the appellants do not own any lands answering to the description in the agreement, for we find neither allegation nor proof to that effect.

It is conjectured, however, by the respondent's counsel that it was because the appellants' share of the whole tract as ascertained by the sale made in February, 1849, was

$11,906 77, and that they purchased lands to the extent and value of $18,979 84: thus exceeding their interest, under the general average, the sum of $7,073 07; and that, by decree of the Court, this excess was directed to be paid by instalments, and was to be a lien and charge upon the whole of appellants lands until paid, and because of some supposed lien of Judge Law for his compensation.

There was no reference to a Master to ascertain the state of the titles, &c. From the same exhibit, the decree of the Court in the partition suit, it appears that the appellants purchased eighteen sections of land, on which the sum of $7,073 07, together with a sum due for costs, was charged; and it further appears that if the instalments had been duly paid, about which payment however there is no evidence, there would have remained due for principal and interest at the time of the decree, about $3,200. Taking this hypothesis to be true, is a charge of $3,200 upon eighteen parcels of land, containing in the aggregate 11,774 acres, and valued at $18,979, such an incumbrance as would justify a Master in reporting against a title?

In Daniel's Chy. Pr., it is said, that when the title is clear, but there are terms or incumbrances to be got in, the Master should report in favor of the title. Before he does so, however, he should be satisfied that the terms or incumbrances can be got in. If he is not satisfied on this point, he should report that a good title cannot be made, unless the terms, &c., can be got in. Vol. 2, p. 873, (Harrisburg ed.) citing Bennett, 152. In Coffin vs. Cooper, 14 Vesey R. 205, on a motion to discharge a purchaser upon the Master's report, Lord Eldon ruled that where the Master's report is that the vendor getting in a term or getting administration, &c. will have a title, the Court will put him under terms to procure it speedily, and denied the motion. See also Wood vs. Bernal, 19 Vesey R. 221, and

Halsey vs. Grant, 13 Vesey R. 73. From these citations, it will be seen that the question of title, so far as respects charges and incumbrances, depends on their character and amount, and whether or not they can be got in within a reasonable time by the vendor; and from the want of a Master's report, or proofs of the state of the title at the date of the decree, we have no means of testing the correctness of the recital that specific performance could not be decreed for this cause. As there are no facts in the record upon which any of the foregoing hypotheses can be sustained, can the recital aforesaid be founded on the position assumed in the argument here by the counsel for the appellants, that a Court of Equity will not enforce against a husband a specific performance of an agreement to dispose of his wife's estate, but will refer the purchaser to a Court of law for his remedy, and upon which it was urged that the decree should be reversed, and the bill dismissed? The point has been the subject of much difference in opinion. In Hall vs. Hardy, 3 P. Wms. R. 189, Sir Joseph Jekyl, M. R., said : " There have been an hundred pre-" cedents where, if the husband, for a valuable considera-" tion, covenants that the wife shall join with him in a fine, " the Court has decreed the husband to do it, for that he " has undertaken it, and must lie by it if he does not per-" form it." To the same effect are the cases of Barrington vs. Horn decided by Ld. Ch. Cowper, (5 Vin. Ab. 547, pl. 35,) Morris vs. Stephenson, decided Sir Wm. Grant, M. R. (7 Vesey R. 478,) and that of Withers vs. Pinchard, decided by Lord Rosslyn, cited in the argument of the last cited case. In opposition may be cited Otread vs. Round, also decided by Ld. Ch. Cowper, (4 Vin. Ab. 203, pl. 4,) in which the wife had expressly refused. The Chancellor says : " It is a tender point to compel the husband by a " decree to procure his wife to levy a fine, though there

20

" have been some precedents in this Court for it, and it is
" a great breach upon the wisdom of the law which secures
" the wife's lands from being aliened by the husband with-
" out her free and voluntary consent, to lay a necessity
" upon the wife to part with her lands, or otherwise to
" cause her husband laying in prison all his days;" and
said he did not think it proper in the case to decree a spe-
cific performance of the covenant, but that the defendant
must refund the purchase money paid, with costs. In
Emery vs. Wase, (8 Vesey R. 514,) Lord Eldon doubts
whether the point was as well settled as it was understood
to be; and in Innes vs. Jackson, (16 Vesey R. 370,) he
says he considers it still doubtful. There is also a *dictum*
of Ch. Baron Alexander, in Frederick vs. Coxwell, (3
Young and Jer. 514,) that he considered the rule to be
shaken. Amidst this contrariety of opinion, and believ-
ing, as declared by Lord Eldon, that the policy of the law
is, that a wife is not to part with her property but by her
own spontaneous and free will, we should be inclined to
refuse in any case an absolute decree for specific perform-
ance against the husband, on the ground that it is calcula-
ted to invade that policy.

We regard with much favor the decree made by Sir John
Strange, M. R., in Sedgewick vs. Hargrave, (2 Vesey Senr.
R. 57.) In that case the sum of £200 had been paid to the
husband as a compensation for the relinquishment of his
wife's interest in an estate. On refusal to convey, and up-
on bill filed against them, the Judge observed, that he
feared a bare decree on the husband to join, or procure
his wife to join, might not answer the ends of justice; and
as he was not warranted to make a personal decree on the
wife, he directed the husband to join in a conveyance, and
to procure her so to do; and to induce him, he added the
alternative that if he does not, in the time and manner di-

rected by the Master, perform it, he should repay the plaintiff the money advanced. So, in this case, regarding the service rendered as the payment for the land, the Court might decree in the alternative that the appellant, John H. Lewis, convey and procure his wife to join with him, or pay the value of the lands, which value should be previously ascertained by reference to a Master, whose report, with the evidence on which it is founded, would enable the Chancellor to arrive at a correct conclusion on the point.

The decree continues to recite that, considering the respondent here entitled to compensation for his services as solicitor for said appellants, it is therefore ordered, adjudged and decreed that the appellants (John H. Lewis and Mary his wife) pay or cause to be paid to the respondent the sum of two thousand five hundred dollars, with interest from the decree, and awards execution generally, &c. This decree is doubtless intended to be in accordance with the alternative prayer of the bill for compensatory damages, but would more properly seem to be based upon a rescision of the contract.

Upon the question whether a Court of Equity may award compensation in damages for the injury sustained by the non-performance of a contract, in the event of the primary relief for a specific performance failing, we have no doubt. It is not within the jurisdiction of the Court. The cases in the English Courts which maintain the affirmative of the proposition, are Denton vs. Stewart, 1 Coxe's cases, 258, and Greenaway vs. Adams, 12 Vesey R. 395, both of which are doubted in Gwillim vs. Stone, 14 Vesey R., 128, and expressly overruled in Todd vs. Gee, 17 Vesey R., 274-279, and in Sainsbury vs. Jones, 5 Mylne. & Craig R., 1-3. The American cases cited in the argument here, so far as they are upon the point, are decided expressly on the authority of the overruled cases, and are not consider-

ed as giving any additional weight to them. The cases of compensation in Equity, says Ch. Baron Alexander, in Newham vs. May, 13 Price R., 749, have grown out of the jurisdiction of the Courts of Equity, as exercised in respect of contracts for the purchase of real property, where it is often ancillary as incidentally necessary to effectuate decrees of specific performance. Thus, where a specific performance is decreed, upon the application of either party, with an allowance to be made for any deficiency as to the quantity, quality or description of the property, or for any delay in performing the contract. Nelson vs. Bridges, 2 Beavan R., 239, Todd vs. Gee, 17 Vesey R., 278, Grant vs. Munts, Cooper's Equity cases, 173, Dyer vs. Hargrave, 10 Vesey R., 505, Wilkinson vs. Torkington, 2 Y. & Coll. cases, 726, Hepburn vs. Auld, 5 Cranch R., 278. Or where the suit is by the vendor against the vendee, the Court decreeing specific performance, will also decree the payment of the purchase money, or, as in the case of Sedgewick vs. Hargrave, before cited, where the vendor was decreed to convey, and procure his wife to join, or to repay the purchase money. In all these and similar cases, the jurisdiction properly attaches in equity as ancillary to the relief granted by the decree, and as necessary to make it effectual. By keeping this distinction in view, it will reconcile the apparent contrariety of the decisions on the subject. When the Court below ascertained that specific performance could not be decreed, the jurisdiction of Equity terminated, and the bill should have been dismissed.

How far the principle we have asserted would be applicable in a case where *pendente lite* and with a view to defeat the plaintiff of his specific performance, the vendor should convey or incumber the property, it is not necessa-

ry for us to decide, as we do not find any such fraudulent conduct imputable to the appellants.

The compensation or damages awarded, appear by the decree to have been ascertained on the basis of the value of the services of the respondent as solicitor, &c. for the appellants, which was a virtual rescision or setting aside of the contract between the parties, by which the value of the services was estimated. One thousand acres of land of average quality, to be located by the respondent, was settled and fixed as the equivalent of the services rendered. It was therefore erroneous; the damages or compensation, if proper to be allowed, should have been estimated by the value of the land.

The decree is also erroneous in rendering a judgment in *personam* against Mrs. Lewis, for the reasons and upon authorities heretofore cited.

We are, therefore, of opinion that the decree rendered in this cause should be reversed—holding, as we do, that the contract which the respondent prayed to be enforced against the appellants, is not the contract which the parties entered into; that there is no sufficient shewing in the record to support the declaration in the decree that the contract, which the Court below ascertained, could not be specifically performed; that compensation cannot be decreed when specific performance is denied; that the basis on which the amount of compensation was ascertained, is incorrect; and that a decree in *personam* cannot be rendered in a Court of Equity against a *femme covert*, and especially upon a contract she never entered into.

What disposition shall be made of the case?

The counsel for the appellants insist that a party seeking specific performance, must recover on the case as made in the bill, and cannot recover on a case made by the evidence at the trial, and that this Court should dismiss the

bill of complaint. As a general proposition, the authorities cited seem to sustain the position assumed, but great latitude has been allowed to a plaintiff in making amendments. Lord Redesdale in Lindsay vs. Lynch, (2 Sch. and Lefroy R. 9,) mentions a case where a plaintiff filed a bill stating an agreement, and the defendant, by his answer, admitted that there was an agreement, but different from that stated by the plaintiff; and it was held that the plaintiff might amend his bill, abandoning his first agreement, and praying for a decree according to that admitted by the defendant.

Although this course was denied by Lord Redesdale to the plaintiff, in Lindsay vs. Lynch, it was because the plaintiff had amended his bill after the coming in of the answer; and had persisted in his original demand, praying in the alternative for that, or for a decree according to the agreement admitted by the answer; which course his Lordship considered as unfair and improper.

This case differs from Lindsay vs. Lynch, which was the case of a parol agreement; here it is in writing, and the reason given does not apply. We are inclined to adopt the precedent mentioned by Lord Redesdale as the rule to govern this case.

Let the decree of the Court below be reversed, and the cause remanded to the Circuit Court of the Eastern Circuit sitting in the County of Alachua, with directions to allow the respondent, upon application, to amend his bill according to the suggestions herein, and pray for a specific performance of the contract admitted by the appellant, John H. Lewis, in his answer, upon the terms of furnishing said appellant with a copy of the amendments, gratis; and for such other and further proceedings, not inconsistent with this opinion, and according to the usual

course of proceedings in Equity, as may be requisite and proper in the premises.

Let the appellants recover the costs and charges by them expended and incurred in and about the prosecution of their appeal.